NO. 13-20527

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
NEW ORLEANS, LOUISIANA

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

v.

TED RUSSELL SCHWARTZ MURRAY,
DEFENDANT-APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
NO. 4:13-CV-00032

_____

BRIEF IN SUPPORT OF APPLICATION
FOR CERTIFICATE OF APPEALABILITY
FOR APPELLANT
TED RUSSELL SCHWARTZ MURRAY

_____

GARY A. UDASHEN
STATE BAR NO. 20369590

SORRELS, UDASHEN & ANTON
2311 CEDAR SPRINGS ROAD
SUITE 250
DALLAS, TEXAS 75201
(214) 468-8100
(214) 468-8104 (fax)

ATTORNEY FOR DEFENDANT-
APPELLANT

## **CERTIFICATE OF INTERESTED PERSONS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** §<br>        **Plaintiff-Appellee,** §<br> §<br>**v.** §    **NO. 13-20527**<br> §<br>**TED RUSSELL SCHWARTZ MURRAY,** §<br>        **Defendant-Appellant.** § | |

The undersigned counsel of record certifies that the following listed persons and entities, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

(a)    Vanessa Gilmore, District Court Judge, Southern District of Texas, Houston.

(b)    Cedric Joubert, United States Attorney's Office, Houston, Texas.

(c)    Eileen K. Wilson, Mary Jane Harmon, Renata Ann Gowie, United States Attorney's Office, Houston, Texas. Government Attorneys.

(d)    Gary A. Udashen, 2311 Cedar Springs Road, Suite 250, Dallas, Texas 75201; Attorney of Record for Ted Russell Schwartz Murray.

(e)    Edwin Tomko, 1717 Main Street, Suite 4000, Dallas, Texas 75201; Attorney of Record for Ted Russell Schwartz Murray at Trial and Sentencing.

(f)    Ted Russell Schwartz Murray - Appellant

_____/s/ Gary A. Udashen_____

GARY A. UDASHEN
SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
(214) 468-8100
(214) 468-8104 (fax)

ATTORNEY OF RECORD

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is requested.  This case raises novel and complicated questions of fact and law and oral argument will be of assistance to the Court.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . .  i-ii

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . .  iii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv-vi

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vii-x

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-5

ARGUMENT

Standard for Issuance of a Certificate of Appealability. . . . . . . . . . . . . . . . . .  5-6

ISSUE I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6-8

        Should a certificate of appealability be issued to review the order of the
        district court finding that Murray did not receive ineffective assistance
        of counsel at trial based on defense counsel's serious illness and
        hospitalization during trial and the resulting failure to investigate and
        take appropriate steps to remove a biased juror from the jury?

Facts Constituting Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . .  8-9

Affidavit From Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9-10

        A.      Juror Who Heard Negative Information Against Mr. Murray. . .  10-17

Government's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17-22

District Court's Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Murray Was Harmed By This Omission of Counsel . . . . . . . . . . . . . . . . . . . . 22-24

       B.    Defense Counsel Continuing with the Trial Despite His Health Status
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-29

Government's Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

District Court's Ruling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-34

ISSUE II.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

      Should a certificate of appealability be issued to review the order of the
      district court that Murray did not receive ineffective assistance of
      counsel at the sentencing hearing based on the failure of defense counsel
      to object to the use of the wrong guideline manual based on an *ex post
      facto* violation resulting in a dramatic increase in the sentence, as well
      as properly challenge the government's loss evidence?

       A.    Failure to Object to Use of Wrong Sentencing Guideline Book.  34-35

           1.    Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-35
           2.    Appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36
           3.    Failure to Object Constitutes Ineffective Assistance of Counsel
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-39

Government's Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-44

District Court's Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

           6.    Murray Was Clearly Harmed by Counsel's Omission . . . . . . 46

       B.    Failure of Defense Counsel to Adequately Challenge the Loss Amount
           at The Sentencing Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

           1.    Facts Establishing Ineffective Assistance. . . . . . . . . . . . . 46-50

Government's Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

District Court Order.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-51

ISSUE III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-53

Should a Certificate of Appealability Be Issued To Determine if the District Court Erred in Denying the 2255 Petition Without Holding an Evidentiary Hearing?

CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# TABLE OF AUTHORITIES

## CASES                                                         Page

*Arizona v. Fulminante,* 499 U.S. 279 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Aron v. United States,* 291 F.3d 708 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 52

*Barefoot v. Estelle,* 463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Bellamy v. Cogdell,* 952 F.2d 626 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 23

*Biagas v. Valentine*, 265 Fed.Appx. 166 (5th Cir. 2008) . . . . . . . 15, 16, 18, 19, 21

*Brooks v. Dretke*, 444 F.3d 328 (5th Cir. 2006) .. . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Burdine v. Johnson,* 66 F. Supp. 2d 854 (S.D. Tex. 1999) . . . . . . . . . . . . . . . . . . 23

*Coppage v. McKune,* 534 F.3d 1279 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 5

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 7

*Dickson v. Quarterman,* 453 F.3d 643 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 6

*Foster v. Johnson*, 293 F.3d 766 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Gideon v. Wainwright,* 372 U.S. 335 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Glover v. United States*, 531 U.S. 198 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . . 33, 38

*Graves v. Cockrell,* 351 F.3d 143 (5th Cir. 2003),
*cert.* denied, 541 U.S. 1057 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Houchin v. Zavaras*, 924 F.Supp. 115 (D. Colo. 1996) . . . . . . . . . . . . . . . . . . . . . 6

*Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 15

*Johnson v. Carroll*, 327 F.Supp.2d 386 (D. Delaware, 2004) . . . . . . . . . . . . . . . . 6

*Johnson v. United States*, 313 F.3d 815 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . 34

*Johnson v. United States*, 604 F.3d 1016 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . 52

*Kimmelman v. Morrison*, 477 U.S. 365 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lafler v. Cooper*, 132 S.Ct. 1376 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Love v. McCray*, 413 F.3d 192 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McMann v. Richardson*, 397 U.S. 759 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Miller-El v. Cockrell,* 537 U.S. 322 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Nix v. Whiteside*, 475 U.S. 157 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Owens v. United States*, 551 F.2d 1053 (5th Cir.),
*cert. denied*, 434 U.S. 848 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Peugh v. United States*, 133 S.Ct. 2072 (2013). . . . . . . . . . . . . . . . . . . . 38, 39, 44

*Pilchak v. Camper*, 935 F.2d 145 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 28

*Potts v. United States*, 566 F.Supp.2d 525 (N.D. Tex. 2008) . . . . . . . . . . . . . . . 33

*Schriro v. Landrigan,* 550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) . 52

*Slack v. McDaniel,* 529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . 7, 8, 14, 33

*Summerlin v. Schiro*, 427 F.3d 623 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 7

*Tippins v. Walker,* 77 F.3d 682 (2nd Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Arledge*, 553 F.3d 881 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . 40

*United States v. Booker*, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Castillo-Estevez*, 597 F.3d 238 (5th Cir.),
*cert. denied*, 131 S.Ct. 457 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Conley*, 349 F.3d 837 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 33

*United States v. Day*, 969 F.2d 39 (3rd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Fischetti*, 450 F.2d 34 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . 40

*United States v. Franks*, 230 F.3d 811 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 33

*United States v. Girard*, 744 F.2d 1170 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . 40

*United States v. Gonzalez*, 214 F.3d 1109 (9th Cir. 2000). . . . . . . . . . . . . . . . . . 17

*United States v. Harfst*, 168 F.3d 398 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . 34

*United States v. McCoy*, 410 F.3d 124 (3rd Cir. 2005) . . . . . . . . . . . . . . . . . . . . 52

*United States v. Murray*, 648 F.3d 251 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . 2, 35

*United States v. Murray*, 700 F.3d 241 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . 2

*United States v. Reed*, 719 F.3d 369 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . 6, 52

*United States v. Smack*, 347 F.3d 533 (3rd Cir. 2003) . . . . . . . . . . . . . . . . . . . . 34

*United States v. Smith*, 454 Fed. Appx. 260 (5th Cir. 2011) . . . . . . . . . . . . . . . 33

*United States v. Stricklin*, 290 F.3d 748 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . 33

*United States v. White*, 869 F.2d 822 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . 40

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006). . . . . . . . . . . . . . . 14, 18, 19, 21, 24

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## CODES AND RULES

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. §2253(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 51

## SENTENCING GUIDELINES

U.S.S.G. Ch. 5, Pt. A, Sentencing Table. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## STATEMENT OF JURISDICTION

Murray appeals the final order denying and dismissing his Motion Under 28 U.S.C. §2255 to Vacate, Set Aside or Correct a Sentence By a Person in Federal Custody entered by the district court on September 3, 2013. The district court had jurisdiction pursuant to 28 U.S.C. §§1331 and 2255. This Court has jurisdiction pursuant to 28 U.S.C. §1291 and also 28 U.S.C. §2253(a) if it grants a Certificate of Appealability ("COA"). The district court entered its amended final judgment on September 2, 2013.

## STATEMENT OF ISSUES

I.      Should a certificate of appealability be issued to review the order of the district court finding that Murray did not receive ineffective assistance of counsel at trial based on defense counsel's serious illness and hospitalization during trial and the resulting failure to investigate and take appropriate steps to remove a biased juror from the jury?

II.     Should a certificate of appealability be issued to review the order of the district court that Murray did not receive ineffective assistance of counsel at the sentencing hearing based on the failure of defense counsel to object to the use of the wrong guideline manual based on an *ex post facto* violation resulting in a dramatic increase in the sentence, as well as properly challenge the government's loss evidence?

III.    Should a certificate of appealability be issued to decide whether the district

court erred in deciding this 2255 petition without holding an evidentiary hearing?

## STATEMENT OF THE CASE

Murray was convicted of filing a false tax return and conspiracy to commit mail fraud, securities fraud, and money laundering.  ROA. 566.  David Lapin and Jeffrey Wigginton, who entered guilty pleas, were also charged in the fraud counts. Specifically, the defendants were alleged to have misrepresented a real estate program to investors.  ROA. 552.

On November 23, 2009, the district court sentenced Murray to serve 240 months imprisonment and three-years supervised release.  ROA. 570.  The court imposed a $2,200 special assessment, but no fine or restitution.  R. 1589.

On July 27, 2011, the Court of Appeals affirmed the conviction.  *United States v. Murray*, 648 F.3d 251 (5th Cir. 2011).  Murray's Petition for Rehearing En Banc and Writ of Certiorari were denied.

Six months after Murray was sentenced, the government moved for an order of restitution. Murray objected to the government's belated request.  ROA. 581-583.

The district court granted the government's motion for restitution order and assessed restitution in the amount of $17,564,534.21.   ROA. 590.

Appeal was taken from the district court's restitution order.  ROA. 591.  On October 30, 2012, the Court of Appeals reversed the district court's restitution order. *United States v. Murray*, 700 F.3d 241 (5th Cir. 2012).

On January 4, 2013, Murray filed his 2255 motion. ROA. 4-144. The district court subsequently denied and dismissed the 2255 Motion and denied a Certificate of Appealability. ROA. 294-347.

## SUMMARY OF ARGUMENT

In the middle of this complex and lengthy trial, defense counsel became seriously ill and spent several days in the hospital. As a result of his illness, his ability to effectively represent Murray was severely compromised. However, rather than ask for a delay in the trial or a mistrial, counsel, without any input from his client, continued with the trial. The results were catastrophic to Murray.

Murray's 2255 Motion alleged constitutional ineffectiveness of counsel at trial and sentencing. While substantial ineffectiveness was attributable to counsel's illness, other instances of ineffectiveness were the result of neglect and inattention. Moreover, not only were several claims not contradicted by the record, Murray's former trial attorney executed an affidavit attesting to the fact that he was ineffective and that certain decisions at trial and sentencing were not the product of any strategy. ROA. 130-144. The government opposed relief, but offered no evidence to refute the affidavit from Murray's former counsel.

Former counsel's affidavit addressed two instances of ineffective assistance raised in the 2255 Motion. These were that, 1) Murray received ineffective assistance of counsel at trial when, based on counsel's serious illness and hospitalization during

trial, he failed to move to challenge or strike a juror who had heard negative things about Murray from a friend during the trial which caused the juror to be biased against Murray, and 2) former counsel failed to object to the use of the wrong version of the sentencing guidelines, which resulted in a dramatic increase in Murray's sentencing.

This affidavit, as well as the trial and sentencing record, established that Murray received ineffective assistance of counsel at both the trial and sentencing proceedings. In fact, based on the record, no hearing was necessary in order to grant the 2255 Motion. Murray nevertheless suggested, as an alternative to the granting of the motion based on the record, that the court hold an evidentiary hearing. Nevertheless, the district court denied relief without a hearing. The district court also denied a Certificate of Appealability. ROA. 294-347.

In issuing its ruling, the district court simply ignored the medical records of trial counsel, filed under seal as part of the 2255 petition. ROA. (sealed document). Further, the court ignored the evaluation of defense counsel's medical condition by Dr. Galbraith. ROA. (sealed document).

Moreover, the record before the Court demonstrated that defense counsel rendered ineffective assistance at sentencing in failing to object to the use of the wrong guideline manual based on an *ex post facto* violation and present evidence concerning the loss amount. The result of these errors was a significantly harsher

prison sentence than called for by a correct guideline application.

The failure of the district court to grant relief, or at least holding a hearing, calls for the granting of a Certificate of Appealability.

## ARGUMENT

### Standard for Issuance of a Certificate of Appealability

Murray must obtain a Certificate of Appealability in order to appeal the denial of his 2255 Petition. The certificate should issue if Murray has "demonstrate[d] that his petition involves issues which are debatable among jurists or that the issues are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 330 (2003); *Coppage v. McKune,* 534 F.3d 1279 1281 (10th Cir. 2008).

Under 28 U.S.C. § 2253 and *Barefoot v. Estelle,* 463 U.S. 880, 893-894 (1983), a certificate should issue when there is a "showing that reasonable jurists could debate whether (or, for that matter agree that) the petition could have been resolved in a different manner or that the issues were 'adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quoting *Barefoot, supra* at 893 and n. 4).

The only question before a court is whether it is debatable that a constitutional violation has occurred, for "a COA determination is a separate proceeding, one distinct from the underlying merits," *Miller-El,* 537 U.S. at 340-348. See *Graves v. Cockrell,* 351 F.3d 143, 150 (5 th Cir. 2003), *cert.* denied, 541 U.S. 1057 (2004)

("Any doubt regarding whether to grant a COA is resolved in favor of the petitioner"); *Dickson v. Quarterman,* 453 F.3d 643, 647 (5th Cir. 2006) (granting COA after quoting from *Miller-El,* 537 U.S. at 342): 'The question is the debatability of the underlying constitutional claim, not the resolution of that debate.") *See, Foster v. Johnson*, 293 F.3d 766 (5th Cir. 2002) (granting certificate of appealability on ineffective assistance ground); *United States v. Reed*, 719 F.3d 369 (5th Cir. 2013) (granting certificate of appealability and reversing based on ineffective assistance of counsel); *Love v. McCray*, 413 F.3d 192 (2nd Cir. 2005) (petitioner entitled to certificate of appealability on claim of ineffective assistance of counsel); *Johnson v. Carroll*, 327 F.Supp.2d 386 (D. Delaware, 2004) (granting certificate of appealability on ineffective assistance claim); *Houchin v. Zavaras*, 924 F.Supp. 115 (D. Colo. 1996) (petitioner made serious and substantial showing of denial of constitutional right to effective assistance of counsel).

## Issue I:

**Should a certificate of appealability be issued to review the order of the district court finding that Murray did not receive ineffective assistance of counsel at trial based on defense counsel's serious illness and hospitalization during trial and the resulting failure to investigate and take appropriate steps to remove a biased juror from the jury?**

A defendant is entitled to the effective assistance of counsel as required by the

Sixth Amendment to the United States Constitution. *Gideon v. Wainwright,* 372 U.S. 335 (1963); *McMann v. Richardson*, 397 U.S. 759, 771 (1970); *Summerlin v. Schiro*, 427 F.3d 623 (9th Cir. 2005). Effective assistance is denied if, "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668 (1984). *See*, *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005); *Kimmelman v. Morrison*, 477 U.S. 365 (1986); *Lafler v. Cooper*, 132 S.Ct. 1376 (2012) (performance prong of *Strickland* test requires a defendant to show that counsel's representation fell below an objective standard of reasonableness).

To satisfy the prejudice requirement, the record must demonstrate that, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That is, "a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687). This in not an outcome-determinative test. *Nix v. Whiteside*, 475 U.S. 157 (1986). The question is not whether a defendant would have more likely than not received a different verdict but for counsel's performance,

but whether, "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 454 (1995) (applying same harm test in suppression of exculpatory evidence case as applied on ineffective assistance cases).

Although *Strickland* requires a showing of prejudice, it does not require the defendant to show that his counsel's deficient performance, *more likely than not*, altered the outcome of the case.  *Strickland*, 466 U.S. at 693.  The result at trial "can be rendered unreliable, and hence the proceeding itself unfair, even if the error of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. at 694.

## Facts Constituting Ineffective Assistance

In his 2255 Petition, Murray identified several serious and highly prejudicial acts and omissions by defense counsel related to the trial of this case.  Among these instances of ineffective assistance of counsel were the following:

1.     Failure to move to strike a juror who heard negative information from a friend concerning Murray in the middle of the trial.  This outside information caused the juror to have a bias against Murray.

2.     Defense counsel continuing with the trial despite the fact that he was seriously ill and spent several days in the hospital in the middle of trial.  The medical ailments were so serious that his memory of important events during the trial was impaired.

The record shows that counsel's illness directly caused his failure to move to strike the biased juror. Moreover, counsel's illness was serious enough that he was clearly too sick to continue the trial following his hospitalization. And, most importantly, an affidavit from defense counsel, filed with this 2255 petition, established that he rendered ineffective assistance precisely as Murray alleged.

## Affidavit From Defense Counsel

Former counsel's affidavit addressed two of the ineffective assistance allegations. In its entirety, the affidavit stated:

> "My name is Edwin J. Tomko. I am an attorney licensed to practice law in the State of Texas, as well as the United States District Court for the Southern District of Texas. I represented Ted Russell Schwartz Murray in cause number 4:06-CR-00247 in the United States District Court for the Southern District of Texas at a trial which occurred in 2008, with sentencing in 2009. This affidavit is to address two questions concerning Mr. Murray's trial and sentencing.
>
> 1.      On September 30, 2008, during a break in the trial, I was ill and was in the hospital. While I was in the hospital, I participated in a phone conference with Judge Vanessa Gilmore, who was the United States District Judge who was presiding over Mr. Murray's trial. I have read a transcript of this phone conference in order to submit this affidavit. A copy of the transcript of this phone conference is attached to this affidavit. In this phone conference, Judge Gilmore informed me and Assistant United States Attorney Cedric Joubert that a juror had contacted the Court and informed the Court that the juror had told a friend of hers that she was on a jury and the friend indicated that she had some knowledge of the case regarding Mr. Murray. In this phone conversation, Judge Gilmore summarized for the attorneys what her recollection was of what the juror said and told us that there was a record made of the phone conference with the juror that the attorneys could look at.
>
>      I did not look at the record that was made of this phone conference with the juror. In fact, I did not remember being given the

information by the Judge about this juror or what she told the Court. The conversation where the Judge told me and the prosecutor about this juror occurred while I was in the hospital and I did not remember it when I left the hospital and resumed the trial.  My not reviewing the transcript of the conversation between the Court and this juror or taking any further action concerning this juror was not a result of any trial strategy on my part.

2.      At the sentencing hearing in this case, and prior to the sentencing hearing when I was preparing objections to the presentence report and sentencing arguments, I did not make any objections that the probation department had used the wrong sentencing guideline book in violation of the *Ex Post Facto* Clause.  My not making this objection was not a result of any trial strategy on my part."  ROA. 130-144.

## A.      Juror Who Heard Negative Information Against Mr. Murray

During the middle of the trial, a juror reported to the court that she had heard some negative comments from a friend outside the courtroom about Mr. Murray. The juror reported that these comments caused her to have a bias against Murray and made her feel she could not be impartial.  The court held a phone conference with the juror without the attorneys present, where the following occurred:[1]

> "But I understood that there was a possibility that you might want to speak to me or mention something to me that was of concern to you.
> . . .
> JUROR: -- my daughter has a horse and went out to the – I hadn't been taking her because of the trial, and I went out there just to make sure things were arranged for the horse, you know, for the hurricane.
> THE COURT:  Right.
> JUROR:  And I walked up and they said, "Well, where have you been?" And I said, "Well, I'm on a case.  I'm on – I'm on jury duty and I won't be here for several weeks."
>       And my friend, who's out there, she just blurted out, "**Well, I**

---

[1]*See* Volume 7 of trial record.

**hope you're not on that Ted Murray crook's case**. I just read about it in the paper." And that's what she said to me, and I said, "Well, I really can't talk about it." That was it. And, so , I – you know, I know this person pretty well, and I just -- I thought I had to mention that to you.

THE COURT: Okay. Was that – so, you didn't have any further discussions with her about it, then, I take it?

JUROR: No. And I didn't, you know, I didn't say anything about – you know, I didn't say anything about – I didn't say anything. I just said, "You know what? I can't talk about this."

THE COURT: Okay. Well, that – that is not really of concern to me. Obviously, the case is being covered in the paper and people –

JUROR: Yeah.

THE COURT: -- are going to make stray comments about things that are written in the paper. And, I mean, even if you try to avoid it, you might still hear about something on the radio or TV about the case.

JUROR: Yeah. That's how I got it.

THE COURT: That's just –

JUROR: Her husband is in the insurance business, and I was wondering why she said – you know, how would she know, but her husband is in the insurance business and I guess maybe he has feelings. I don't know.

THE COURT: No, no. There's been a lot of media coverage about it, so . .

JUROR: Okay. Well, I hadn't read about it, so . . .

THE COURT: It's somewhat unavoidable, but it's not that much of a concern to me that someone – that you would have even heard or read something about it or that someone commented to you about it. The only way that it would be a concern to me is if you say to me that something that you've read or seen or heard outside the courtroom would keep you from judging this case based on what you hear in the courtroom. Do you believe –

JUROR: Yeah.

THE COURT: Do you – do you think that you'll still be able to evaluate the case based on what you've heard in the courtroom?

JUROR: I think so. **I mean, I must admit that, you know, I know this girl pretty well, so . . .**

THE COURT: The fact that she read something in the paper would influence you?

**JUROR: Well, I don't know if she read something in the paper. I don't know – yeah, I don't know if she read it, if she just – I guess.**

**Is that what it said in the paper? I don't know. I assumed she was saying that because she knew it, but I don't – I can't say that for a fact.**

THE COURT: But you didn't have any discussion about it with her?

JUROR: No.

THE COURT: Okay. Then at this point in time, I don't think I'm concerned about it at all. I just wanted to make sure that you still feel like you'll evaluate the case based on what you hear in the courtroom.

JUROR: Yes."

. . .

JUROR: **My only concern is that I know her well.** That's the only thing, is that I know her well and –

THE COURT: And the fact that she made a comment about him.

JUROR: I keep thinking – I keep thinking, you know, but, you know, I just –

THE COURT: Well, I mean, the fact that you know somebody –

**JUROR: It's very hard for me. I have to admit to you that it's been hard for me. I've been thinking about it, and it's hard.**

THE COURT: Okay. Well, but the fact that you know somebody who comments about some aspect of the case is not really, you know, that much of a concern even, you know, if – but unless you engaged in some further discussion and conversation with her and said, "Oh, what do you know about him? How do you know him? What's the scoop on him? Can you tell me anything that I don't know that I haven't heard in trial," that would be of concern to me. But you're telling me that none of that has happened in this instance; is that right?

JUROR: Yes. ROA. 110-117.

Later, the court informed the attorneys of the conversation with the juror,

stating the following:

"Oh, and then one other juror contacted me. I forgot. Good grief. I have so much stuff to tell you, guys. One other juror contacted me because she felt that, in the interest of disclosure, she was upset because she went to a place where her daughter takes lessons and somebody came up to her and asked her why had she been missing all of the lessons that her daughter takes, and she said she hadn't been coming and wouldn't be coming for the foreseeable future because she was on jury duty, and that's all she said. And the woman said to her, "Oh, I hope

you're not on that case involving Money Mortgage because – because – that I read about in the paper because that guy sounds like a crook."

And, so, she did not engage the woman in further conversation, but she was upset that someone had said that to her. I said, "Well, did you tell the people you were on that jury?" She said, "No." I said, "Did you engage her in any further conversation?" She said, "No," but she felt like she needed to tell me that someone had made this stray comment to her. And I told her, "Look, y'all are not sequestered. I didn't tell you, you know, to – that, you know, you can't talk to anybody about anything. And people are going to make stray comments to you about things that they read in the paper, and you may accidentally see something yourself on television or in the press."

So, to the extent that she just wanted to make sure she disclosed that that had occurred to me. **I talked to her on the record. You guys can take a look at the record, if you'd like to,** but that was pretty much the full extent of it. I think that probably I'm going to just deal that with a cautionary instruction as part of the charge and leave it at that because I can't stop people from making stray comments to jurors unless I, you know, lock them away.

MR. JOUBERT:  Yes, Your Honor.

MR. TOMKO:  Okay.

THE COURT:  So, that's all that I can, you know, think of to do about that. But she was – she was concerned that, you know, someone had make this comment to her, so she wanted to report it to me. I told her I appreciated it, and pretty much I told her that, you know, "Don't engage anybody in any conversation." She said she hadn't. And I said, you know, "Just try to avoid it if you can," and that was pretty much how we left it. So, that's about all we can do.

So, I'm hoping we can keep a jury together long enough to finish this case.

MR. JOUBERT:  Yes, Your Honor.

MR. TOMKO:  That's why I want to keep moving. I don't want to just fall out. I just think that would be bad.

THE COURT:  Okay. Okay. Well, then, we'll go ahead and start. So, we've got seven plus five at least, more or less, less or more, additional trial days that we've still got to try to get in, correct, lawyers, more or less." ROA. 118-129.

The court's recollection of the conversation with the juror, as recounted to the

attorneys, was incomplete. In fact, the juror was not at all certain that the information her friend heard was from news reports and believed it may have been something the friend knew. Nevertheless, the court informed the attorneys that a record was made of the conversation with the juror and the attorneys could review it.

Defense counsel admitted in his affidavit that he did not review the record and had no recollection of the judge telling him about the court's conversation with the juror. As a result, defense counsel did not move to excuse the juror despite this highly prejudicial information. Under the facts of this situation, the juror should have been removed and defense counsel acted deficiently in not taking steps to accomplish this.

The applicable law in this regard is as follows:

In *Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006), the court held that the failure of counsel to challenge a venireperson who indicated they could not be fair and impartial to the defendant was plainly deficient representation under *Strickland* and established ineffective assistance of counsel.

In *Virgil*, the court made the following points that are pertinent to the case at bar:

> "Statements from a person providing witness to a juror 'outside' the courtroom are barred under the Sixth Amendment's Confrontation Clause." Page 4, 14 and 15.

> "Certain errors in the trial process are so basic to a fair trial as to defy harmless error review. It is clearly established that the U.S. Supreme

Court views the denial of the right to an impartial decisionmaker to be such an error that taints any resulting conviction with 'constitutional infirmity' ." Page 4 and 11.

"A defense counsel's 'strategy' not to challenge a biased juror, is so ill chosen that it permeates the entire trial with obvious unfairness." Page 8.

"Counsel's failure to object on jury-bias grounds created a 'structural error' that was per se prejudicial." Page 19.

"The presence of a biased decisionmaker is 'structural error' subject to automatic reversal'. A criminal defendant is entitled to have his conviction set aside, no matter how strong the evidence against him." Page 5 and 19.

"The U.S. Supreme Court has held that 'structural' defects, in the constitution of the trial mechanism are per se prejudicial. The existence of 'structural' errors require 'automatic reversal of the conviction' because they infect the entire trial process. We also note that trying a defendant before a biased jury is akin to 'providing him no trial at all'. It constitutes a 'fundamental defect' in the trial mechanism itself." Page 5, 18, and 19.

"Counsel's failure to 'challenge' the juror was 'constitutionally deficient'." Page 13.

"Had Virgil's counsel 'challenged', the trial judge would have been forced to rule, a ruling that counsel could have objected to and pursued as error on direct appeal. There is little doubt that such an error would have been sustained on direct appeal." Page 15.

*See also*, *Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001) (finding that counsel's failure to strike a juror who stated in voir dire that she did not think she could be fair constituted ineffective assistance of counsel.)

Likewise, in *Biagas v. Valentine*, 265 Fed.Appx. 166 (5th Cir. 2008) (not

designated for publication), the court found that trial counsel's failure to challenge a juror denied the defendant effective assistance of counsel.  In *Biagas*, the court made the following points that apply here:

> "Counsel fell below an objective standard for reasonableness when he failed to challenge a biased juror at the appropriate time." Page 13.

> "Any attempt to reconstruct a strategic reason for counsel's 'decision' would be fantastic at best, but this argument never rises out of the mire of absurdity."  Page 15.

> "Even if the record supported (rather than contradicted) the mind boggling inference that counsel deliberately chose this irrational, Janus-faced voir dire strategy, such a 'performance' could never satisfy the constitutional guarantee of effective assistance of counsel. Biagas claim would not be defeated." Page 16.

> "Again, even if the respondent's theory was true, counsel's performance would not be objectively reasonable because it would involve risking Biagas' fundamental right to a trial by an impartial jury...failure to challenge Gamboa was objectively deficient and the respondent's ad-hoc attempts to rehabilitate his performance are legally and factually unavailing." Page 16.

> "The second prong of the Strickland inquiry is satisfied because counsel failed to challenge Gamboa despite his answers expressing bias against the defendant.  Given the fundamental nature of the impartial jury and the consistent line of Supreme Court precedent enforcing it, such a failure was a 'breakdown' in the adversarial process that our system counts on to produce just results." Page 16.

> "Expressed in Strickland terms, the deficient performance of counsel denied Biagas an impartial jury, leaving him with one that could not constitutionally convict..." Page 18.

> "The reasoning from Virgil applies with equal force in this present case." Page 16.

In *United States v. Gonzalez*, 214 F.3d 1109 (9th Cir. 2000), the court held that a judge was obligated to excuse a juror for cause under either an implied or express bias theory and that bias or prejudice of even a single juror is enough to violate a defendant's Sixth Amendment guarantee of a verdict by an impartial jury. *See also*, *Brooks v. Dretke*, 444 F.3d 328 (5th Cir. 2006) (recognizing doctrine of implied bias as clearly established federal law).

Moreover, the district court's inquiry was inadequate. The Court in fact stated that the issue was of "no concern" *to her;* she felt there was no problem. The transcript reveals through the juror's repeated statements of concern, that she harbored deep reservations about her ability to remain impartial. It is obvious the juror wanted to say more about the issue, as evidenced by actually cutting off Judge Gilmore, as Judge Gilmore attempted to conclude the phone conversation, and then telling the Judge how hard this situation was for her.

The failure of Murray's counsel to make an effort to remove this juror allowed a juror to sit in judgment of him who had heard negative information that was directly pertinent to the charges, from a person who the juror knew. This was highly prejudicial and allowed the injection of extraneous information into the jury deliberations.

**Government's Arguments**

In response, the government argues that Murray cannot show on the record in

this case that there was any likelihood that a motion to remove the juror in the middle of the trial would have been granted. The flaw in this argument is the assumption that the district court would not have followed the law, as set out in *Virgil* and the other cases cited by Mr. Murray. In fact, there is a high likelihood that a proper motion to remove this juror would have resulted in the district court removing her from the jury.[2] Nevertheless, if the district court declined to remove the juror, under *Virgil* and *Biagas* it is highly probable that the Court of Appeals would have reversed the conviction.

Secondly, the government argues that there is no showing that a failure by Murray's counsel to attempt to remove this juror "was outside the range of reasonable performance by counsel." This government argument is directly contradicted by *Virgil* and *Biagas*.

Moreover, the government's attempt to distinguish *Virgil* and *Biagas* is also unavailing. The government's argument is that,

> "The two Fifth Circuit cases Murray cites in support of his claim involve jurors who stated in voir dire that they could not be fair are distinguishable from this case." (p. 22, Government's Response).

However, having claimed that these cases are distinguishable, the government fails to actually distinguish them. The fact that the jurors at issue in *Virgil* and *Biagas*

---

[2]In *Virgil*, the court recognized that "doubts about the existence of actual bias should be resolved against permitting the juror to serve."

indicated their bias during voir dire, rather than in the middle of trial, is a difference without a distinction. In fact, a juror being told something negative about a defendant in the middle of a trial creating a bias in the juror is even more obviously harmful then some generalized expression of belief in the word of a law enforcement officer as was the issue in *Virgil* and *Biagas*.

According to the government, the juror at issue in Murray's case said that she could still evaluate the case based on what she heard in the courtroom. However, the government fails to address the totality of the juror's statement. In fact, what the juror said was that this friend told her Ted Murray was a crook, she knows the friend pretty well, the friend's husband is in the insurance business and may have feelings about Murray, she assumed her friend made the comments about Murray because she knew it, the juror keeps thinking about it and this has been hard for her. (RR7, p. 1272).

The government's characterization of the juror's comments as being that she said she could still evaluate the case based on what she heard in the courtroom is simply inaccurate. In fact, the juror was obviously trying to tell the district court that she could not be fair and her final statement was that her friend's comments had made this situation hard for her and she keeps thinking about it.

It is also important to note that the juror did not believe that her friend's only knowledge of Ted Murray was from reading about him in the newspaper. While she

said her friend may have read about Murray in the paper, she also believed her friend had other knowledge of Murray.  Moreover, the district court informed the juror that the newspaper was covering the trial extensively, increasing the bias that came from her friend's comments.

Moreover, when the juror explained to the district court that her friend's husband was in the insurance business and this may be the source of the information, the district court dismissed that suggestion and did not follow up with more questions.

Additionally, when the district court asked the juror if she would still be able to evaluate the case based on what she heard in the courtroom, the juror gave a very weak qualified answer of, "I think so."  This answer was followed up with a further attempt by the juror to explain to the district court that she really did not think she could be impartial because of her relationship with her friend and that she assumed her friend had personal knowledge of the negative information about Murray.  Once again, the district court did not follow up on the juror's comments and instead redirected the conversation to the question of whether the juror had any further discussions with her friend.  In fact, the district court told the juror that she was not concerned about the situation and then asked a suggestive question as to whether the juror still felt like she could evaluate the case based on what she heard in the courtroom.  The juror's yes answer to that may have been no more than

acknowledgment that she understood what the Court was saying, in light of the fact that the Court obviously was not willing to accept her expression of concern. Nevertheless, it is certainly incorrect to conclude that the juror felt that she could be impartial on this case. In fact, it is clear that she could not.

Moreover, a close reading of the exchange between the juror and the court shows that the comments relied on by the district court were simply acquiescence to the authority of the court. The court repeatedly questioned the juror and suggested reasons why this conversation with her friend might not affect her. However, the juror continually resisted the court's suggestions. At the very least, defense counsel should have reviewed this record and requested an opportunity to further question the juror.

The record in this case shows that counsel rendered ineffective assistance in not challenging this juror. Counsel's affidavit demonstrates that this failure to challenge the juror was not the result of trial strategy. Rather, it was because of counsel's illness necessitating hospitalization.

As the Fifth Circuit stated in *Virgil*, "certain errors in the trial process are so basic to a fair trial as to defy harmless error review." Just as the court in *Virgil* and *Biagas* found constitutional infirmity by the failure of defense counsel to remove a biased juror, the same should be found here. Therefore, the record is complete on this issue and the district court should have found that defense counsel was ineffective in

not challenging this juror and making efforts to have the juror removed from the jury. *See, Wiggins v. Smith*, 539 U.S. 510 (2003) (failure to investigate is ineffective assistance).

**District Court's Ruling** (ROA. 294-347).

The district court's finding that Murray did not receive ineffective assistance based on these facts was based on the following erroneous conclusions:

1.     The juror confirmed she could evaluate the case based on the evidence.

2.     That counsel knew about the incident and did not consider it "highly prejudicial." (Amended Order, p. 14).

Of course, a complete review of the colloquy between the district court and the juror shows just the opposite of the conclusion stated by the district court. The juror expressed considerable doubt as to her ability to be fair to Murray and decide the case strictly on the evidence presented in court. The district court's conclusion that "counsel knew about the incident and did not consider it "highly prejudicial" finds no support in the record and is directly contradicted by counsel's affidavit. In fact, counsel did not know about the incident because it was relayed to him by the court while he was extremely ill and in the hospital and he did not remember even receiving the information.

**Murray Was Harmed By This Omission of Counsel**

Counsel's affidavit, coupled with the medical records, undermines confidence

in the verdict in this case. Reasonable jurists could debate the district court's resolution of this claim, and refusal to even hold a hearing on the issue. *See Bellamy v. Cogdell,* 952 F.2d 626 (2nd Cir. 1991) (trial counsel who admitted to physical and mental incapacity two weeks before trial without defendant knowing of counsel's incapacity, constituted ineffective assistance of counsel per se). Counsel's medical condition effectively left Murray with no counsel at all. *See e.g. Burdine v. Johnson,* 66 F. Supp. 2d 854 (S.D. Tex. 1999) (defendant denied effective assistance of counsel where counsel slept through portion of trial). This is analogous to the instant case, in that counsel admits he was virtually sleepwalking while talking to the judge on the phone about the juror and thereafter. It is reasonable to infer that counsel's performance suffered mightily during the remainder of trial. See *Tippins v. Walker,* 77 F.3d 682 (2nd Cir. 1996) (counsel's sleeping during trial denied habeas petitioner of right to effective assistance of counsel, even in light of absence of identifying any specific errors resulting in prejudice, prejudice arose from the fact that during critical portions of trial, where petitioner's liberty was at stake, petitioner had no counsel). Simply put, Murray would have been far better off with "no counsel", as at least then he would have become aware of the juror and her bias and inability to remain impartial and could have moved to investigate, voir dire, challenge and strike.

Moreover, the question as to whether there was a valid reason for not making a 'challenge' to a biased juror 'never arises'. Since defense counsel has averred to

having 'no recollection', it would be 'impossible' for him to have made the

constitutionally mandated 'challenge' under *Virgil,* supra. As in *Virgil,* the case at bar

has been tainted with a constitutional infirmity requiring reversal of the conviction.

## B.    Defense Counsel Continuing with the Trial Despite His Health Status

In the middle of the trial, defense counsel, Mr. Tomko, suffered a serious health

problem and spent several days in the hospital.  The court learned of this from a third

party and held a phone conversation with the attorneys, without Mr. Murray's

presence or knowledge.[3]  In this phone conversation, the following occurred:

> "THE COURT:  Hello, lawyers.
> MR. TOMKO:  Hi, how are you?
> MR. JOUBERT:  Hello, Judge.
> THE COURT:  I guess I'm doing better than you are, Ed.
> MR. TOMKO:  You are substantially.  Trust me.
> THE COURT:  Look, I want to tell you I was talking about you behind your back.
> MR. TOMKO:  To whom?
> THE COURT:  Let me tell you who I ran into the other day, Bob Dolan.
> MR. TOMKO:  Oh, gee.
> THE COURT:  And he said – I said , "Ed Tomko is in the hospital," he said, "Oh, no.  He probably got upset and his ulcer probably started bleeding."  And then Esthela calls me and said, "Mr. Tomko has a bleeding ulcer."  So, I want you to know that we were talking about you.  So, I don't like to talk about people behind their backs, so I'm just calling to make a full admission right now.
> MR. TOMKO:  Evidently, he was right on the money.
> THE COURT:  So, what's – what's your prognosis and what's your thought process?  I want to hear it from the horse's mouth.

---

[3]Mr. Murray was informed that counsel had been in the hospital.  However, he was not told of the seriousness of counsel's condition and was told that counsel was capable of continuing with the trial.  Later, when Mr. Murray asked to see counsel's medical records, he refused.  ROA. 236-239.

MR. TOMKO: Here's where I am. When I went in the hospital, the normal hemoglobin level for a man is 14 to 15.

THE COURT: Uh-huh.

MR. TOMKO: And mine was 7.9.

THE COURT: Okay.

MR. TOMKO: They gave me two blood transfusions. Each one of those raises your hemoglobin level by one point.

THE COURT: Oh, wow.

MR. TOMKO: So, I'm about a 10. so, I am extremely anemic right now.

THE COURT: I got you.

MR. TOMKO: And, so , what I think I can do, if we do the mornings, I think I can do the mornings and – but I can't do all day. I can't. I'm supposed to lay down and rest from time to time. And the more I sit, the better I am. The more I stand, the lightheaded – the more lightheaded I get.

THE COURT: Okay. I mean, is there any point in us doing – I mean, I'm just asking. Only you know how you feel and –

MR. TOMKO: You know, Jason is sure helping me.

THE COURT: Okay. Okay. Is he going to – is he going to sit second, then, through the rest of the trial?

MR. TOMKO: Yeah. He's going to take some witnesses and stuff, yeah.[4]

THE COURT: Oh, Jason Ross, right?

MR. TOMKO: Yes.

THE COURT: Okay. Okay. Okay.

MR. TOMKO: I think with his help we can do the mornings. I would like to try to do the mornings. I don't want to overstep any more than possible.

THE COURT: So, you're thinking 8:00 to 12:00 –

MR. TOMKO: Yes.

THE COURT: Wednesday, Thursday, and Friday of this week and then we'll decide on Friday, what, next week?

MR. TOMKO: Just see how we're doing, yeah.

THE COURT: Okay. So, then, on Friday we'll decide what next week's schedule looks like?

---

[4]In fact, Jason Ross did very little in the trial and Mr. Tomko continued to cross-examine witnesses and make arguments.

MR. TOMKO:  Yeah, because the doctor said it's going to be weeks before my anemia is gone, before my hemoglobin level is built up to normal.  It's going to take – it's not going to happen overnight.  It's going to take a long time."  ROA. 118-129.

As shown, the court inquired of defense counsel as to whether he was well enough to continue with the trial and appeared willing to delay the trial to make accommodations for his health condition.  It appeared that the court was open to various alternatives including a continuance or mistrial.  Yet, defense counsel chose to continue the trial without informing Murray that he had been in the hospital or that the court was willing to consider other alternatives to an immediate procession through the trial.

Certainly a person on trial for his future and his freedom has a right to know if his attorney has suffered serious health events such as that suffered by counsel here.  When counsel failed to share these complete facts with Murray, he deprived him of crucial important information.  A decision by counsel to proceed with the trial despite his health condition was one that Murray should have been informed of and allowed to have input in.

As argued previously, the illness of counsel directly led to ineffective assistance in his representation.  The record shows that there were several serious errors constituting ineffective assistance of counsel.  Defense counsel is a highly experienced attorney and the fact that these errors were made were likely be attributable to his health condition.

As defense counsel explained to the court, he had a bleeding ulcer requiring blood transfusions, was anemic and weak and incapable of operating at even the most minimal level necessary to provide effective assistance of counsel.

It should also be noted that when the jury complained of the short days and delays in the trial, the court informed them of defense counsel's health problems and that this was the reason for these delays. This effectively told the jury that their time was being wasted as a result of defense counsel's health condition. The likelihood is that this made them more pre-disposed towards a guilty verdict.

Judge Gilmore's awareness of counsel's continuing worsening condition was further evidenced on record as follows towards the conclusion of the trial:

COUNSEL: "I'm sorry for the breaks, but it's hard. I'm having a hard time." ROA. 4455

"I'm going to try to rest this weekend as much as I can." ROA. 4455.

Additionally, as a result of defense counsel's illness, another attorney from his firm came into the picture and began participating in the trial. This was at a time when the trial was well underway and the fact that defense counsel brought in help at this late stage is an indication that he was not well enough to see this trial to its conclusions.

Defense counsel's illness obviously affected his ability to provide zealous, effective representation in this very complex case. He was physically and mentally exhausted and had trouble keeping up with the grueling schedule of a trial. Defense

counsel was unable to stand at the podium, was speaking in court in a very soft and weak voice which the jury had trouble hearing and needed numerous recesses in order to rest. His ability to cross-examine witnesses and make appropriate arguments in a convincing manner was significantly compromised.

In order to achieve a not guilty verdict, it was necessary for defense counsel to convince the jury that Lapin was responsible for the fraud and not Murray. The evidence was available to make this argument. Unfortunately, counsel's illness made it impossible for him to do so. When defense counsel became ill in the middle of the trial, he should have informed Murray. He should have also followed through on the court's willingness to delay the trial or declare a mistrial. Failure to do these things constitutes ineffective assistance of counsel.

Murray would also ask the court to consider this as the type of trial error for which a harm analysis is inappropriate. There are some types of errors where the ability to quantify the harm is so difficult and the right denied so fundamental, that harm is presumed. In *Arizona v. Fulminante,* 499 U.S. 279 (1991), the court discussed the existence of, ". . . structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error standards.'" The court identified some structural errors as, absence of counsel, trial by a judge who is not impartial, unlawful exclusion of jurors based on race from a grand jury, right to self-representation at trial and right to public trial. *See also*, *Pilchak v. Camper*, 935 F.2d

145 (8th Cir. 1991) (representation by lawyer with Alzheimer's disease entitled defendant to writ relief regardless of whether she could show cause and prejudice for any procedural default).

Here, the defense attorney was clearly incapable of providing the representation contemplated by the Sixth Amendment. He was seriously ill. In order to have effective assistance of counsel an attorney must have the energy and focus necessary to do the job. The illness of defense counsel here was so serious that there is a certainty that Murray did not receive constitutionally adequate representation.

## Government's Response

In response, the government states that "the record does not show that Murray was not present during this proceeding on the record. ..." Of course, the government is well aware that Murray was not present during this phone conference between the attorneys and the Court. ROA. 238-39. Moreover, the government states that "Murray does not report whether he himself asked counsel whether he should proceed or asked other questions of counsel regarding counsel's health issues. ..." In fact, Murray asked these very questions, including asking Mr. Tomko to allow him to review Mr. Tomko's medical records. These requests were rebuffed by Mr. Tomko. Essentially, the government failed to rebut the fact of defense counsel's serious illness in any way.

## District Court's Ruling

In rejecting this argument, the district court stated:

"First, there is nothing in the record to suggest that counsel's health issues impeded his ability to zealously advocate on behalf of his client." District Court Order, p. 16.

To the contrary, Murray has pointed to specific and serious errors of counsel that are directly attributable to his illness.   The most glaring example is defense counsel's failure to even be cognizant of the fact that a juror, mid-trial, had expressed a bias against Murray based on comments made to her by a friend.

The medical records reveal that Mr. Tomko did not just have a garden variety ulcer; he had a near death experience with massive and rapid blood loss from internal bleeding requiring a surgical arterial cauterization. The district court failed to grasp the import of the medical information, because the court's order makes absolutely *no reference* to Murray's overwhelming and specifically detailed evidence in its order.

Importantly, the district court fails to acknowledge or address the affidavit submitted by Murray from Dr. James Galbraith, M.D.  Dr. Galbraith reviewed the medical records of defense counsel from his hospital stay and stated the following:

"My name is James Galbraith, M.D.  My mailing address is P. O. Box 800125, Dallas, Texas 75380.  My phone number is 214-912-8245.

I am a medical doctor in general medical practice and have practiced medicine since 1974. I reviewed the medical records from Ed Tomko from St. Luke's Hospital.

Mr. Tomko was seen in St. Luke's Hospital E.R. on September 25, 2008.  His initial complaints were nausea, vomiting and dark stool for two days.  He was also complaining of dizziness and a feeling that he "wanted to pass out."

Mr. Tomko was admitted for gastrointestinal bleeding, dehydration, hypovolemia, melena, nausea and vomiting.   The gastrointestinal bleeding was later determined to be secondary to a

bleeding duodenal ulcer, which resulted in severe anemia. He received two units of blood while in the hospital after his initial hemoglobin was found to be 7.9. This was corrected by transfusion to 10.1 with the normal hemoglobin in St. Luke's Episcopal laboratory being 13.0 - 16.8 Grams/deciliter. Hemoglobin carries oxygen to all areas of the body including the brain. Low hemoglobin levels can lead to fatigue, tachycardia, and lack of concentration depending on the amount and rapidity of blood loss. Rapid severe uncorrected blood loss can result in loss of consciousness, heart failure and death. Mr. Tomko then underwent an artery cauterization procedure by his gastroenterologist to stabilize his life threatening condition. He was later discharged from the hospital to follow up with his doctor.

The condition for which he was treated was extremely serious and if left untreated was surely to be fatal.

In my opinion, Mr. Tomko's ability to act as counsel in a complicated federal criminal trial would be markedly impaired. The associated above-mentioned symptoms would most likely unnecessarily have distracted him from his duties as a trial lawyer. His anemia was not completely corrected at the time of hospital discharge, although the transfusions helped replace blood that had been lost. Weakness and dizziness would have persisted for days or weeks until his bone marrow was able to replace all of the lost blood through natural processes. During the days following his hospitalization, focus and concentration would have most likely been impaired to an unknown degree as his recovery continued.

Mr. Tomko should have avoided strenuous activity in the days following his hospitalization to allow his anemia to correct itself. His gastroenterologist commented in his September 26, 2008 hospital note that he was at high risk of re-bleeding. It is in my opinion that he should not have undertaken the stress of trial until his recovery was complete.

The significance of Mr. Tomko's blood loss depends in large measure on the rate and amount of loss. Slow loss allows the body to adapt more effectively and rapid loss does not properly allow such adaptation and is much more severe. Mr. Tomko was at great risk of a catastrophic re-bleed. In my opinion, an actively bleeding duodenal ulcer such as seen in Mr. Tomko can be life threatening if not stabilized emergently." (ROA. Clerk's Record - Sealed Document).

Ignoring this affidavit is certainly not something all jurists of reason would do.

In fact, no reasonable jurist would ignore this affidavit. The affidavit clearly establishes that defense counsel's illness was serious, life threatening and that he was medically incapacitated such that he was in no condition to continue with this trial.

The district court made further insupportable medical assessments of Mr. Tomko's condition, stating: "[C]ounsel had ulcer issues, which has no effect on his cognitive abilities to represent Murray. Counsel was confident that he could continue the case once he was released from the hospital" thus there was no deficiency in counsel's performance. (District Court's Order p. 16.) Once again, the district court ignored counsel's affidavit, wherein he stated he had no memory of the relevant conversation with the judge, even *after* the trial resumed, and his failures in this regard were *not* strategic. Additionally, the district court ignores Dr. Galbraith's affidavit.

Moreover, the district court's suggestion that counsel's in-hospital statements indicated an ability to adequately defend Murray despite his illness, ignores the fact that counsel had no recollection, or ability to be cognizant of, that entire conversation. Simply put, the district court had no basis in fact to support the conclusions it reached and it ignored the overwhelming and uncontested evidence to the contrary.

The district court also concluded that "Murray cannot show that the failure to continue the trial was prejudicial." (District Court Order, p. 16). Again, the district court ignores the substantial evidence discussed above which shows constitutionally

inadequate representation directly caused by counsel's illness.

## Issue II:

**Should a certificate of appealability be issued to review the order of the district court that Murray did not receive ineffective assistance of counsel at the sentencing hearing based on the failure of defense counsel to object to the use of the wrong guideline manual based on an *ex post facto* violation resulting in a dramatic increase in the sentence, as well as properly challenge the government's loss evidence?**

The principles of *Strickland v. Washington* apply to sentencing proceedings in Federal court. *Glover v. United States*, 531 U.S. 198 (2001). The Fifth Circuit has frequently found ineffective assistance of counsel based on deficient performance and prejudice at the sentencing phase of a Federal prosecution. *United States v. Conley*, 349 F.3d 837 (5th Cir. 2003) (counsel's failure to object to sentence higher than maximum available); *United States v. Franks*, 230 F.3d 811 (5th Cir. 2000) (failure to object to improper sentencing enhancement); *United States v. Stricklin*, 290 F.3d 748 (5th Cir. 2002) (failure to object to improper quantity of drugs); *United States v. Smith*, 454 Fed. Appx. 260 (5th Cir. 2011) (not designated for publication) (failure to object to 12 year sentence when guideline provided for 7 year sentence); *see also*, *Potts v. United States*, 566 F.Supp.2d 525 (N.D. Tex. 2008) (failing to object to impermissible double counting).

Other circuits have also found ineffective assistance based on deficient representation by counsel at the sentencing phase. *United States v. Smack*, 347 F.3d 533 (3rd Cir. 2003) (failure to argue for lower drug quantity); *United States v. Harfst*, 168 F.3d 398 (10th Cir. 1999) (failure to argue for minor role adjustment); *Johnson v. United States*, 313 F.3d 815 (2nd Cir. 2002) (failure to object to calculation of drug quantity).

**A.** **Failure to Object to Use of Wrong Sentencing Guideline Book**

**1.** **Sentencing**

At the sentencing hearing, the following occurred:

The PSR applied the 2001 version of the guideline noting, "Due to ex post facto considerations, the 2001 edition of the Guidelines Manual has been used in this case. PSR ¶ 61. Because there are only forty-three offense levels, the offense level was reduced from forty-four to forty-three. *See* PSR ¶ 90. With an offense level of forty-three and a criminal history category of I, the guideline range for imprisonment was life. PSR ¶ 119; U.S.S.G. Ch. 5, Pt. A, Sentencing Table.

Murray filed objections to the methodology behind the calculation of the loss amount. At sentencing, the district court reduced the offense level based on the government's acquiescence. (ROA. 6406). The guideline range, with a revised offense level of forty-two and criminal history category of I was 360 months to life. (ROA. 6395).

The government agreed that even a sentence at the low end of the guideline at 360 months would be unreasonable.  Instead, the government argued, a sentence of 180 months would be reasonable.  (ROA. 6440).  The district court, however, imposed a sentence of 240 months.  (ROA. 6441).

## 2.    **Appeal**

On appeal, Murray argued that the district court's application of the 2001 version of the guidelines violated the Ex Post Facto Clause because the offense ended when Premiere Holdings declared bankruptcy on October 2, 2001, prior to the November 1, 2001, effective date of the 2001 guidelines.

The United States Court of Appeals for the Fifth Circuit concluded that based on the court's decision in *United States v. Castillo-Estevez*, 597 F.3d 238 (5th Cir.), *cert. denied*, 131 S.Ct. 457 (2010), any error in retrospectively applying the guidelines was not plain, regardless of when the conspiracy ended.  *See United States v. Murray*, 648 F.3d 251, 253-254 (5th Cir. 2011).  In *Castillo-Estevez*, the court held that any ex post facto error was no longer plain under an advisory guideline system. *Castillo-Esteves*, 597 F.3d at 241 (discussing the effect of *United States v. Booker*, 543 U.S. 220 (2005) on ex post facto analysis).  The court did not decide whether the Ex Post Facto Clause applied to an advisory guidelines scheme.

Notably, the Fifth Circuit's opinion did not conclude that Murray was incorrect in his contention that the wrong guideline book was used.  Rather, the court only

decided that this was not plain error.

### 3.   Failure to Object Constitutes Ineffective Assistance of Counsel

In fact, the offense ended prior to November 1, 2001, so application of the

2001 guidelines was an *ex post facto* violation.

In his brief on appeal to the Fifth Circuit, Murray argued as follows:

"B.     Because the Guideline Amendments Upwardly Adjusting Both
        the Base Offense Level and the Enhancements Became Effective
        on November 1, 2001, after Premiere Filed for Bankruptcy, the
        2000 Version of the Guidelines Applies.

The PSR applied the 2001 version of the guidelines in Mr.
Murray's case, noting, 'Due to ex post facto considerations, the 2001
edition of the Guidelines Manual has been used in this case.' PSR ¶ 61.
Although the PSR's intent was to avoid ex post facto issues, because the
offense concluded prior to the effective date of the 2001 guidelines, the
PSR should have applied the 2000 version.

The Ex Post Facto Clause prohibits the retroactive application of
criminal laws that pose a significant risk of increasing the penalty
beyond that in effect at the time the defendant committed the offense.
*See* U. S. Const. art. I, § 9, cl. 3; Garner v. Jones, 529 U.S. 244, 255
(2000); Miller v. Florida, 482 U.S. 423, 429 (1987). The test for
whether a law is ex post facto is whether it (1) 'is retrospective, that is,
it must apply to events occurring before its enactment;' and (2)
'disadvantage[s] the offender affected by it.' Id. (citation omitted). The
Court has applied the ex post facto analysis in the context of the
guidelines. See United States v. Suarez, 911 F.2d 1016, 1021-1022 (5th
Cir. 1990); see also United States v. Davidson, 984 F.2d 651, 655 (5th
Cir. 1993) (applying Suarez).

In Suarez, the Court explained that applying an amended
sentencing guideline to an offense that occurred before the amendment's
effective date is a retrospective application. Id. at 1022. If the
application of the amendment even creates a possibility of a higher
sentence, that amendment substantially disadvantages the defendant. Id.

The application of the 2001 guidelines was retrospective in this
case. The last overt act in the offense was alleged to have occurred on

October 1, 2001. <u>See</u> Indictment at 9. Premiere filed for bankruptcy protection on October 2, 2001. PSR ¶ 33. The effective date of the 2001 guideline was on November 1, 2001. <u>See</u> USSG app. C, Amendment 617 (2001).

Given the substantial upward adjustment to both the base offense level and the available adjustments based on the amount of loss, among other things, the 2001 amendment to the guidelines created a possibility of a higher sentence, substantially disadvantaging Mr. Murray. The underlined items below are those affecting the offense level that were added or increased in the 2001 amendment to the guidelines.

**<u>Offense Level Calculation as Modified by the District Court</u>**

| Calculation | Levels | USSG § | Description |
|---|---|---|---|
| **<u>Base Offense Level</u>** | **<u>6</u>** | **<u>2B1.1(a)</u>** | **<u>18 U.S.C. §1341</u>** |
| **<u>Specific Offense Characteristic</u>** | **<u>+24</u>** | **<u>2B1.1(b)(1)(N)</u>** | **<u>Loss exceeded $50 million</u>** |
| **<u>Specific Offense Characteristic</u>** | **<u>+4</u>** | **<u>2B1.1(b)(2)(B)</u>** | **<u>50 or more victims</u>** |
| **Specific Offense Characteristic** | **+2** | **2B1.1(b)(8)(C)** | **Sophisticated means** |
| **Role in the Offense** | **+2** | **3B1.3** | **Abuse of position of trust** |
| **Role in the Offense** | **+4** | **3B1.1(a)** | **Leader/organizer** |
| **Total Offense Level** | **42** | | |

See PSR ¶¶ 70-90; R. 1501. Below are the changed base offense level, loss amount adjustment, and number of victims adjustment, if the 2000 guidelines were used:

**Minimum Changes to Offense Level Using the 2000 Guidelines**

| Calculation | Levels | USSG § | Description |
|---|---|---|---|
| Base Offense Level | 4 | 2B1.1(a) | 18 U.S.C. §1341 |
| Specific Offense Characteristic | +24 | 2B1.1(b)(1)(N) | Loss exceeded $80 million |
| Specific Offense Characteristic | 0 | 2B1.1(b)(2)(B) | 50 or more victims (added in 2001) |
| Total Offense Level (with other adjustments remaining the same) | 32 | | |

Accordingly, Mr. Murray suffered the retrospective application of the 2001 guidelines, which created the possibility of a higher sentence. Under Suarez and its progeny, he has demonstrated an ex post facto error that is plain. *See* Suarez, 911 F2d at 1021-1022. As demonstrated above, this error affected Mr. Murray's substantial rights. Even without addressing the other errors raised on appeal, applying the 2000 guidelines results in at least a ten-level reduction in the offense level, from forty-two to thirty-two. An offense level of thirty-two and a criminal history category of 1 yields a guideline range of 121-151 months. USSG Ch. 5, Pt. A, Sentencing Table, significantly less than the 360-months-to-life range adopted by the district court, and at least 89 months less than the 240-month sentence he received.

Given the magnitude of the effect on the sentence, it was clearly ineffective for counsel to not object. *See Glover*, *supra*.

The fact that defense counsel was ineffective in not making this objection was recently confirmed by the Supreme Court in *Peugh v. United States*, 133 S.Ct. 2072

(2013). In *Peugh*, the court held that the *Ex Post Facto* Clause is violated when a defendant is sentenced under current guidelines providing a higher sentencing range than the guidelines in effect at the time of the offense.

**Government's Response**

The government did not contend that the failure to object to the use of the wrong guideline book, when there was a substantial increase in the guideline range as a result, is not ineffective assistance. Rather, the government argued that the conspiracy continued after the effective date of the 2001 guidelines. The fallacy of this argument is apparent from a review of the record in this case.

The government's contention in their response on this 2255 Motion, that the conspiracy continued to December 2001, is the exact same argument made in their brief to the Fifth Circuit Court of Appeals on direct appeal. The Court of Appeals did not address this argument on appeal, rather finding that the error argued by Murray was not plain error in light of the lack of objection.

After the government raised this exact argument in its appellate brief, Murray deconstructed the government's argument in his reply brief the same response was made in the 2255 proceedings.

The government's argument is that the conspiracy lasted through December 2001, after the 2001 guidelines became effective. The government provides no support for the assertion that merely because the indictment alleges that the

conspiracy continued beyond a particular point, the government is relieved of the burden of demonstrating with evidence that the conspiracy actually continued beyond that point.  The indictment is not proof of the continuation of the conspiracy.  *Cf. United States v. Fischetti*, 450 F.2d 34, 41 (5th Cir. 1971) (despite the indictment's allegation that the conspiracy continued into December, the last significant act in the conspiracy was committed in August, when the defendant received his last payment, marking the end of the conspiracy).

Every case the government cited involved evidence, not merely allegations, that the conspiracy continued past the date the new guidelines became effective.  *See*, *United States v. Arledge*, 553 F.3d 881, 897 (5th Cir. 2008); *United States v. White*, 869 F.2d 822, 826 (5th Cir. 1989); *United States v. Girard*, 744 F.2d 1170, 1172-1173 (5th Cir. 1984).  As the government acknowledges, the indictment alleges no overt acts on or after the effective date of the 2001 guidelines.  The last overt act listed in the indictment was October 1, 2001.  Indictment at 9.  On October 2, 2001, Premiere filed for Chapter 11 bankruptcy protection.  R. 2355; Def. Ex. 1.

Even if it were permissible to rely on allegations alone to determine when the conspiracy ended, which it is not, the allegations in the indictment do not support an inference that the conspiracy, as alleged, could continue past the filing of bankruptcy.  The object of the conspiracy was to "promote, market, and sell to investors by false representations and promises, unregistered security interests in a mortgage loan

program through which the defendants enriched themselves by concealing fees and failing to disclose material facts to investors." Indictment at 3. No marketing or concealing of fees or failing to disclose facts could occur after Premiere declared bankruptcy, because at that point, defendants ceased marketing and making statements and Premiere's asserts were no longer controlled by the defendants. *See* ROA. 3194-3201, 3197-3200, 3351, 3396, 3430, 3550-3558, 3644-3645, 3702, 3743, 4795; 4919-4920, 5029; Def. Ex. 1.

The PSR itself indicates that the scheme ended in September 2001, when Premiere ceased marketing its real estate investment program. *See* PSR ¶ 14. The last account statements that were sent out without informing investors of borrowers' defaults were in October 2001. *See* PSR ¶ 36.

The government argued the existence of, but does not specify, acts that furthered the conspiracy after Murray and his two partners no longer controlled Premiere, when its assets were controlled by the bankruptcy trustee and by the Presidential Partners. Instead, the government provides a series of record citations:

> [T[]he indictment in this case does not include any allegations of overt acts occurring after November 1, 2001. Nor did the government allege that any of the substantive offenses occurred after November 1, 2001. However, a cursory review of the exhibits offered by the government and admitted by the district court reveals that the co-conspirators were engaged in conduct that furthered the conspiracy's objectives long after November 1, 2001, see e.g., Exhibits 75, 388, 397-399, 433, 463-465.

(Gov't Response, p. 31).

Although there was certainly activity with respect to the investment properties after Premiere's bankruptcy, none of this activity was in furtherance of the conspiracy. Instead, the bankruptcy trustee and his successors were working to dispose of Premiere's properties to recover money for the investors. ROA. 3194-3201. There were days of testimony about the efforts of the post-bankruptcy partnerships to recover money for investors and the legal, administrative, and other difficulties the partnerships encountered. *See, e.g.*, ROA. 3197-3200, 3351, 3396, 3550-3558, 3644-3645, 3702, 3743, 4795, 4919-4920, 5029; Gov't Ex. 1303. These efforts were not in furtherance of the conspiracy, as demonstrated below.

The government does not explain the significance of the exhibits it cites, nor does it appear as though they were discussed at trial. The government's cited exhibits include evidence of legal battles over disposing of non-performing loans, such as a letter from an attorney forwarding to Money Mortgage's attorney, Richard Melamed, an application for a restraining order and a restraining order entered November 6, 2001, against David Lapin, individually and as the agent for one of Premiere's developments, and others, preventing them from selling a property that was in foreclosure proceedings. *See* Gov't Ex. 75 available as an exhibit. This is the only cited exhibit that includes the names of any of the three defendants, but it only demonstrates the difficulties in completing and selling the remaining real estate developments. It does not further the fraud in any way.

Also cited are ministerial items of no apparent significance, including a 2002 letter on Premiere's stationery from Walter B. Thurmond to Don Sawtelle forwarding documents from its mortgage serving files. *See* Gov't Ex. 388 (available as an exhibit). The trial testimony reflects that Mr. Sawtelle was one of the leaders of the Adams Partnership after Premiere's bankruptcy. *See* R. 3842.

Other exhibits show that borrowers were delinquent. *See* Gov't Ex. 397-399 (available as an exhibit), Gov't Ex. 433 (available as an exhibit) and Gov't Exs. 463-465 (available as an exhibit). This is not a continuation of the fraud, but the aftermath once Premiere was no longer a going business concern. As of the time of trial, there remained outstanding investments yet to be completed and sold. R. 3850. Under the government's logic, the conspiracy could be yet underway today, although all three defendants were imprisoned and the company they ran has not existed for the better part of a decade.

The government has failed to demonstrate that the application of the 2001 guidelines was not retrospective. Moreover, the government does not dispute that the application of the amended guidelines disadvantaged Murray.

Thus, the status of this issue is the following. The government recognizes and does not contest the assertion that the failure to object to the use of the wrong guideline book would be ineffective assistance. Rather, their contention is that the correct guideline book was used. Since the argument that the correct guideline book

was used is clearly wrong, ineffective assistance of counsel is established.

It also must be noted that the government has not consistently argued that the conspiracy extended past the effective date of the November 2001 guidelines. On September 10, 2013, Murray filed "Appellant's Motion to Recall Mandate and Reconsider Appeal Based on *Peugh v. United States*." This motion concerns the original appeal from the conviction and sentence (No. 09-20813). In this motion, Murray asked the court to exercise its discretion under Fifth Circuit Rule 41.2 and recall the mandate since *Peugh* had now established that it was plain error to use the later guideline version. In response, the government argued against the court exercising this discretion. However, the government's response never contended that the correct guideline book was used.

It should also be noted that the failure to object by defense counsel was not the result of any trial strategy. Defense counsel Edwin Tomko's affidavit addressed this issue and stated:

> "2.    At the sentencing hearing in this case, and prior to the sentencing hearing when I was preparing objections to the presentence report and sentencing arguments, I did not make any objections that the probation department had used the wrong sentencing guideline book in violation of the *Ex Post Facto* Clause. My not making this objection was not a result of any trial strategy on my part." ROA. 130-144.

The record on this issue was complete and established that Murray received ineffective assistance of counsel at the sentencing phase. For this reason, the district court should have granted this 2255 Motion.

**District Court's Order**

In rejecting Murray's argument on this point, the district court basically adopted the government's factually erroneous premise. The court found that the conspiracy continued past the effective date of the newer guidelines because,

1.     The indictment alleged that the conspiracy continued "through about December 2001."

2.     The presentence investigation report noted that the conspiracy lasted from March 1996 to December 2001. (District Court's Order, p. 19-20).

Based on this, the district court concluded that, ". . . any challenge to the use of the 2001 guidelines would have been futile." (District Court's Order, p. 20).

In reaching these conclusions, the district court totally failed to discuss, or even acknowledge, Murray's extensive and well-documented argument that the conspiracy ended before the effective date of the new guidelines. The court's conclusion is both factually and legally incorrect and the failure to address the argument made is certainly noteworthy.

As stated above, Premiere Holdings declared bankruptcy on October 2, 2001, prior to the November 1, 2001, effective date of the 2001 guidelines." The district court's Order never seriously challenges this date as the last date of the conspiracy. Instead, the district court's Order simply cites the PSR, which simply regurgitated the indictment allegation that the conspiracy lasted from March 1996 to December 2001.

However, no trial testimony detailed any overt act in furtherance of the conspiracy after October 2, 2001. For this reason, the mere allegation that the conspiracy lasted until December 2001 is refuted by the fact that the evidence established otherwise.

Moreover, and in total contradiction to this finding, the district court, at the November 23, 2009 sentencing hearing of Mr. Murray made the statement: "Tell me why you think I should use any loss amount other than the loss amount that was determined at the time the bankruptcy was filed." ROA. 6366.

### 6.    **Murray Was Clearly Harmed By Counsel's Omission**

Had defense counsel presented, argued, and then made the objection to the use of the wrong sentencing guideline, 'retroactivity' would never have been an issue and relief would have been granted. This relief would have consisted of either a sentence using the correct 2000 guideline or a resentencing hearing using the correct 2000 sentencing guideline, which would have resulted in a guideline sentence which Murray would likely have already served. For these reasons, a certificate of appealability should issue.

### B.    **Failure of Defense Counsel to Adequately Challenge the Loss Amount at the Sentencing Hearing**

### 1.    **Facts Establishing Ineffective Assistance**

At the sentencing hearing, the PSR claimed a loss amount of 165 million. This was subsequently lowered by the court to 84 million. The methodology of this calculation was challenged on appeal and the Fifth Circuit rejected the challenge.

As noted by the Fifth Circuit, defense counsel did not present any expert testimony challenging the loss amount and thus the government's contention of the proper amount was accepted. However, when the government made its belated effort to collect restitution (which was later vacated by the Fifth Circuit), new counsel, along with counsel for the co-defendants, did present expert testimony on the loss amount.

As fully developed in the restitution hearings held after sentencing, the expert testimony developed by the defense, as well as a searching examination of the government's evidence concerning the loss resulted in a restitution determination of $17,564,534.21.[5] ROA. 2059-2077. *See also* Defendant Ted Russell Schwartz Murray's Memorandum of Law Regarding Restitution. ROA. 2000-2051.

The restitution hearing evidence concerning the loss amount is more accurate than that from the sentencing hearing. If the same evidence presented by different counsel on behalf of Mr. Murray at the restitution hearing been presented by his trial counsel at the sentencing hearing the guidelines would have been at least 4 levels lower.

---

[5]In the opinion vacating the restitution order, the Fifth Circuit stated: "Sentences notwithstanding, proceedings below continued. On May 28, 2010, the government filed a motion seeking restitution under the Mandatory Victims Restitution Act of 1996. Each defendant objected and a hearing on the motion followed. On October 27, 2010, the court granted the government's motion and scheduled a hearing for November 19, 2010, to determine the amount of restitution owed. Several hearings followed, the last on June 1, 2011. The district court ultimately calculated restitution on August 23, 2011, setting the amount of restitution owed at $17,564,534.21."

The loss amount determined at the restitution hearing was somewhere between the $6 million testified to by Elvis Foster, the defense expert, and $17 million as ordered by the court. This is in contrast to the $84 million determined by the court to be the loss amount at the sentencing hearing. In contrast to the sentencing hearing, new defense counsel at the restitution hearing took the following two steps that resulted in a more complete record showing a significantly lower loss amount:

1.     Retained the services of Elvis Foster, who prepared reports analyzing the loss amounts  (Def. Exs. B and B-1).  (Docket Entry No. 353).

2.     Fully challenged the government's claims as to the amount of loss to the investors by vigorous and thorough examination of the U. S. Attorney's Office Victim Impact Coordinator, Kesha Handy.   (Defs. Exs. A-1 and A-2).   This cross-examination established that the restitution form provided by the government to the complainants was incomplete and misleading.  ROA. 6515-6516; 6528, 6534, 6541-6542.

Mr. Foster's report made an accurate assessment of the actual loss to the investors and provides the expert opinion challenging the presentence report that the Fifth Circuit noted was lacking in the record of the sentencing hearing.  Moreover, the examination of Ms. Handy fully impeached the basis for the government to even claim that there was a loss of even $20 million.  ROA. 6508-6551, 6540.  The reason the government's claim of loss was unsupported was that the information gathered

to determine the loss amounts was incomplete and not documented.[6] These problems

included:

A.    Many claimants do not indicate what their investments were.

B.    Many claims are wholly unsupported by any documentation.

C.    Many claims are supported only by a spreadsheet created by the claimant.

D.    Many claims otherwise have incomplete or poor documentation.

E.    Many claims are estimates only.

F.    Many claims rely on auto loans, which were never alleged to be part of the

      fraudulent scheme.

G.    Nearly all claims fail to account for 12% interest earned on the investment.

H.    How the government arrived at the restitution figure is unclear for many

      claimants.

I.    Many claims rely on transactions that have not closed or have recently closed

      and paid in full.  (Defs. Exs. B, B-1 and B-2).

A complete review of the record developed at the restitution hearing will show

that there were significant deficiencies in the representation by defense counsel at the

sentencing hearing.  There was an effective way to challenge the government and

probation officer's loss amount.  However, defense counsel at the sentencing hearing

_____

[6]Ms. Handy testified that she included some alleged losses on her calculations even if the complainant did not submit any documentation.  ROA. 6538-6539, 6575, 6585-6589, 6616-6624, 6625-6634, 6634-6663, 6663-6670, 6483-6674, 6678-6681, 6681-6698, 6711, 6719-6720.

failed to do so.  This resulted in a guideline offense level substantially higher than was appropriate and therefore ineffective assistance of counsel is established.

## Government's Response

In its response, the government cited the Court of Appeals' direct appeal decision.  The government's reliance on this decision misses the point of Mr. Murray's argument.  The evidence that defense counsel should have presented was not in the record before the Court of Appeals on direct appeal.  The question here is not whether the record developed allowed the Court of Appeals to uphold the district court's loss calculation.  The issue is whether defense counsel made an adequate record.

Likewise, the government's distinction between the standards for determining restitution and those for determining the loss amount misses the point.  It is not the standard that is at issue.  It is the fact that defense counsel at the sentencing hearing failed to present the type of evidence new defense counsel presented at the restitution hearing.

## District Court Order

The district court rejected this ineffective assistance of counsel argument, for the following reasons:

1.     The standard for relevant conduct under the Guidelines is more lax than that for determining when conduct can be the basis for restitution.

2.    The loss value for the purposes of restitution does not ordinarily have any bearing on the propriety of the court's loss amount calculation for the purposes of sentencing.  (District Court Order, p. 21).

The district court makes the same analytical error as the government, *i.e.*, citing general principles without any acknowledgment that these principles are not what is at issue here.  The question is not whether there can be a different loss amount for guideline purposes than that for restitution.  It is whether defense counsel was ineffective in not presenting evidence at the sentencing hearing to establish the correct loss amount.

**Issue III:**

**Should a Certificate of Appealability Be Issued To Determine if the District Court Erred in Denying the 2255 Petition Without Holding An Evidentiary Hearing?**

The record before the district court was adequate to grant relief without a hearing.  However, even if the court does not agree, the record was certainly insufficient to actually deny relief without a hearing.

28 U.S.C. §2255 provides that, "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  *See also*, Rule 8 of the Rules Governing

Section 2255 Proceedings for the United States District Courts.

In *Owens v. United States*, 551 F.2d 1053, 1054 (5th Cir.), this court stated that a district court in a federal habeas case should not ordinarily attempt to resolve contested issues of fact without holding an evidentiary hearing. *See also*, *United States v. Reed*, 719 F.3d 369 (5th Cir. 2013) (remanding for evidentiary hearing); *Johnson v. United States*, 604 F.3d 1016 (7th Cir. 2010) (evidentiary hearing was required); *United States v. McCoy*, 410 F.3d 124 (3rd Cir. 2005) (evidentiary hearing was necessary); *United States v. Day*, 969 F.2d 39, 41 (3rd Cir. 1992) (in determining whether hearing required court must accept the truth of the movant's trial allegations unless they are clearly frivolous).

The unresolved factual issues make an evidentiary hearing necessary. "A federal court must consider whether such a hearing could enable an applicant to prove the petitions factual allegations, which, if true, would entitle the applicant to relief." *Schriro v. Landrigan,* 550 U.S. 465, 474, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007).

> "The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only allege - - not prove — reasonably specific, nonconclusory facts that, if true, would entitle him to relief. If the allegations are not affirmatively contradicted by the record and the claims are not patently frivolous, the district court is required to hold an evidentiary hearing. It is in such a hearing that the petitioner must offer proof."

*Aron v. United States,* 291 F.3d 708, 715 n.6 (11th Cir. 2002) (reversing district courts denial of 2255 motion).

Under these standards, Murray has demonstrated that he is entitled to a hearing on this motion.

## CONCLUSION

Murray has made a substantial showing of the denial of a constitutional right. A reasonable jurist could certainly find ineffective assistance has been established. At the very least, this question is debatable among jurists and the issues are adequate to deserve encouragement to proceed further.

For these reasons, a certificate of appealability should be issued.

Respectfully submitted,

_____/s/ Gary A. Udashen_____
GARY A. UDASHEN
State Bar No. 20369590

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road, Suite 250
Dallas, Texas 75201
(214) 468-8100
(214) 468-8104 fax

Attorney of Record For Appellant

## CERTIFICATE OF SERVICE

I certify that today, January 21, 2014, a copy of the Brief for Appellant was electronically served on the United States Attorney's Office for the Southern District of Texas, P. O. Box 61129, Houston, Texas 77208-1129, through all listed counsel of record.

_____/s/ Gary A. Udashen_____
GARY A. UDASHEN

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 5TH CIR. R. 32.2.7(c), undersigned counsel certifies that this brief complies with the type-volume limitations of 5TH CIR. R. 32.2.7(b).

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Wordperfect X5 in 14 point Times New Roman.

_____/s/ Gary A. Udashen_____
GARY A. UDASHEN